IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cr-82 |
| | ) | |
| JOHN WILLIAM KIRBY KELLEY | ) | Hon. Liam O'Grady |
| a/k/a "Carl," | ) | |
| a/k/a "BotGod," | ) | Sentencing Date: March 15, 2021 |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The defendant, John William Kirby Kelley (the "defendant"), comes before the Court for sentencing after pleading guilty to conspiring to transmit in interstate and foreign commerce any communication containing any threat to injure the person of another, in violation of Title 18, United States Code, Section 875(c), all in violation of Title 18, United States Code, Section 371. This was a far-reaching conspiracy in which conspirators made at least 134 threats to injure against both individuals and institutions.   Many of the most influential conspirators, including the defendant, supported targeting individuals and institutions for racist reasons.

The United States has reviewed the Presentence Investigation Report prepared in this case and has no objections.   The United States agrees with the Probation Office that the properly calculated guideline range is 51 to 60 months.   For the reasons set forth below, the United States asks this Court to impose a sentence of 60 months of imprisonment.

However, if the Court were to determine that the guideline range is lower than 51 to 60 months, the United States would still ask this Court to impose a sentence of 60 months of incarceration for several reasons.   First, an upward departure is warranted in this case, which is

an "atypical case" outside the "heartland."   *See* U.S.S.G. Ch.1, Pt.A(1)(4)(b) (using the term "heartland" as a reference to the "set of typical cases embodying the conduct that each guideline describes").   Second, independent of the Guidelines, the sentencing factors set forth in 18 U.S.C. § 3553(a) would counsel for an upward variance.

I.      Factual and Procedural Background

        A.   Background on the Conspiracy

        In and around 2018, the defendant began hosting the #Graveyard Internet Relay Chat channel (the "Graveyard channel") on the Clearnet, which refers to the traditional World Wide Web that is accessible through Google, another search engine, and by typing in the domain.   An Internet Relay Chat ("IRC") is like an internet chat room in that it enables both one-on-one and group communications in "forums," also known as "channels."

        In and around August 2018, the defendant welcomed other participants to the Graveyard channel, including Co-Conspirator 1, who is a Canadian citizen, Co-Conspirator 2, who is a British citizen, and Co-Conspirator 3, who is an American citizen and was then a juvenile. Then, in around October 2018, John Cameron Denton (1:20-cr-154), who is a former leader of the Atomwaffen Division in Texas, which is a white nationalist organization, joined the others in the Graveyard channel.   When Denton joined the channel, the defendant was already familiar with Denton and his white nationalist activities.   The conspirators chose to use monikers while accessing the Graveyard channel, which had the added benefit of concealing their identities. The defendant used the moniker "carl."

        Beginning in and around October 2018, the conspirators began transmitting interstate threats.   More specifically, the conspirators began proposing and choosing targets to "swat" in

the Graveyard channel.   "Swatting" is a harassment tactic that involves deceiving dispatchers into believing that a person or persons are in imminent danger of death or bodily harm, which then causes the dispatchers to send police and emergency services to an unwitting third-party address.   After choosing a victim to swat, the conspirators often used the Graveyard channel to communicate in real time before, during, and after the swatting events.

The conspirators were most active between October 2018 and February 2019.   During this period, the conspirators swatted at least 134 different locations.   The conspirators selected high profile targets including government officials, executives, and journalists.   The conspirators also targeted individuals streaming live videos because the conspirators hoped to observe law enforcement responding to their calls.   Many of the conspirators, including Denton and Co-Conspirators 1, 2, and 3, also chose targets because they were motivated by racial animus.

The defendant was aware that Denton and the other conspirators chose individuals and locations to swat based on racial animus.   The defendant expressed sympathy for these views and used racial slurs in the Graveyard channel.   Further, during a court-authorized search of the defendant's electronics, law enforcement located photographs of bumper stickers glorifying school shootings and recruiting material for Atomwaffen Division and Siege, which is also a white nationalist group.   Indeed, Denton trusted the defendant enough to provide him access to the Siege IRC channel, which was open only to like-minded white nationalists.

B.  How the Conspiracy Executed Swatting Calls

The conspirators used the Graveyard channel to coordinate and plan the swatting events. Co-Conspirators 1 and 2 were the most prolific swatters.   Co-Conspirator 1 often asked other

conspirators in the Graveyard channel to propose swatting targets.    Co-Conspirators 1 and 2 then chose the target from the options presented by fellow conspirators, including the defendant. Once Co-Conspirators 1 and 2 chose a target, the defendant and other conspirators often used the Mumble application to listen to the swatting calls in real time.    Mumble is an open source Voice over Internet Protocol ("VoIP") communication tool that allows users to speak with and listen to each other.    In the Graveyard channel, the defendant and other conspirators also posted internet links to live videos of swatting events and posted past swatting events for entertainment and bragging.

The defendant, who hosted and managed the Graveyard channel, listened to and took part in countless swatting calls.    On many occasions, the defendant also proposed locations and individuals to swat.    For instance, law enforcement obtained incomplete chat logs, which confirmed that on or about November 4, 2018, the defendant provided a YouTube link to conspirators and suggested the conspirators should next swat the person live streaming in the link.    In addition, and as discussed in detail below, the defendant asked Co-Conspirator 1 to swat Old Dominion University, which he was then attending.

The conspirators were able to successfully conceal their identities from law enforcement by using VoIP technology when placing calls.    The VoIP calls were made using the Google Voice services associated with email accounts kasseybaby99.s@gmail.com, jhulxo1000@gmail.com, and other email addresses.    In setting up these accounts, the conspirators used information not readily attributable to the conspirators.    Google logged the calls placed by many of the accounts.    The conspirators also used voice changers to disguise their real voices.    Indeed, law enforcement later recovered a voice changer in the defendant's

room.

Law enforcement finally began to unravel this international conspiracy when the conspirators targeted a then serving United States Cabinet member.   After this event, which is further described below, federal law enforcement opened an investigation.   Over the course of several months, law enforcement were able to identify that the telephone number used in this swatting event was a VoIP number subscribed to the same Google email account, jhullxo1000@gmail.com, used to swat a number of other victims in this case.   As a result, federal law enforcement worked with countless other law enforcement agencies to identity the victims in this conspiracy and the individuals that perpetrated this crime.

While the conspirators placed over 134 swatting calls, this sentencing paper will focus on the swatting events that occurred within the Eastern District of Virginia and Denton's vendetta against ProPublica and a ProPublica journalist (the "Victim").

C.   The Swatting of the Alfred Street Baptist Church in Old Town, Alexandria

On November 3, 2018, at approximately, 7:02 p.m., a caller used a blocked phone number to contact the Alexandria Department of Emergency Communications ("DEC") non-emergency administrative line.   The caller identified himself as "George" and advised that he placed three pipe bombs at the Alfred Street Baptist Church and was going to "blow it up."   The caller stated the word "shooting" and that the caller was going to kill everyone at the church. Additionally, the caller advised he had control over the bombs and would not specify their location.

When the Alexandria Police Department ("APD") responded to Alfred Street Baptist Church, they found parishioners inside worshipping.   While the parishioners sheltered in place,

APD set up a perimeter and used K9 units to sweep the interior and exterior of the building. The explosive sweep produced negative results and APD cleared the scene.   After determining this was a false bomb threat, APD opened an investigation.

Based on its investigation and interviews with conspirators, law enforcement learned that the conspirators used Google Voice services associated with email account kaseybaby99.s@gmail.com to place the swatting call.   Federal investigators later linked this email to countless other swatting calls, including swatting calls placed to Old Dominion University.   Through further investigation, law enforcement identified Co-Conspirator 3, who was a juvenile during the events of this conspiracy.   Co-Conspirator 3 admitted that he chose the Alfred Street Baptist Church as a target because its parishioners were predominantly African American.   Further, Co-Conspirator 3 admitted that he holds white nationalist views and that the defendant visited him in West Virginia.   Co-Conspirator 3 also stated that he did not believe the defendant was a member of Atomwaffen Division; however, he knew the defendant used white supremacist language and helped Denton and others with their white nationalist activities.

D.  The Swatting of Old Dominion University in Norfolk, Virginia

As stated above, the defendant proposed swatting targets on several occasions and was a regular presence in the Graveyard channel, which he hosted.   On November 4, 2018, the defendant was particularly active.   First, he was online during a swatting event and proposed multiple swatting targets.   After a swatting call ended, the defendant proposed his university, Old Dominion University ("ODU"), as a potential target.   In the following exchange, Co-Conspirator 1 asked for the defendant's .edu email in order to establish a Facebook account, which could be used to swat ODU.

6

[20:02] <04~carl> do my college tomorrow

[20:04] <~ Co-Conspirator 1> maybe

[20:04] <~ Co-Conspirator 1> carl

[20:04] <&zheme > sam woodwards hearing is on the 9th

[20:04] <~ Co-Conspirator 1> do u know the login for the edu email u have

[20:06] <04~carl> yeah

[20:06] <04~carl> its in my old dm

[20:06] <04~carl> 1sec

[20:06] <~ Co-Conspirator 1> use it to make a facebook account

[20:06] <~ Co-Conspirator 1> then send me the login for the fb account

[20:06] <~ Co-Conspirator 1> so i can dox younow

[20:07] <04~carl> can you just uhh

[20:07] <04~carl> use a temp email

[20:07] <04~carl> use mine

[20:07] <~ Co-Conspirator 1> no

[20:08] <@wil> who tf is younow

[20:08] <04~carl> why do you need an edu

[20:08] <~ Co-Conspirator 1> because it will pass sms verification

[20:08] <04~carl> oh alright

In this exchange, not only does the defendant propose his university but he also provides his email credentials to further the swatting.    Additionally, in this same conversation, "zheme," reminds the conspirators about a court hearing in the Sam Woodward case.    Sam Woodward is

associated with Atomwaffen Division and is currently charged with murder, use of a deadly weapon, and hate crimes.    Woodward's charges arise out his alleged murder of Blaze Bernstein, who was a sophomore at the University of Pennsylvania.    Bernstein was gay and Jewish. Again, this discussion shows how prevalent Atomwaffen Division and white nationalist discussions were in the Graveyard channel hosted by the defendant.

A few days after this discussion, the defendant, speaking as "carl," reminded conspirators in the Graveyard channel about swatting ODU.

[04:43] <04~carl> fucking lmaoooooooo

[04:43] <02~slimebox> fer reals

[04:43] <02~slimebox> they are pist

[04:43] <02~slimebox> 92 91 90

[04:43] <+Zim_> Yeah they are

[04:43] <04~carl> good job [Co-Conspirator 1]

[04:43] <+Zim_> angy

[04:43] <02~slimebox> he dun it hard

[04:44] <04~carl> https://my.mixtape.moe/hrtzps.png

[04:44] <04~carl> hopefully we get a better crew next time

[04:44] <02~slimebox> whole town shut down, the citizens all shook an scurrd now

[04:44] <04~carl> this was the best by far tho

[04:44] <04~carl> AHAHHAHAHHA

[04:44] <+Zim_> This was hilarious yeah

[04:44] <04~carl> norfolk next, I dont want to goto class on wed

8

[04:44] <02~slimebox> ok saving it

Further, in this conversation, the conspirators discuss another swatting call that occurred on November 4, 2018, to a vape shop in New Hope, Pennsylvania. In response to that swatting call, local law enforcement issued a shelter in place for the small community.

On November 29, 2018, the conspirators executed their first swatting call against ODU. At approximately 2:08 a.m., ODU Police Department ("ODUPD") received a phone call from a blocked number. The caller stated they were armed with an AR-15 and had placed multiple pipe bombs within the campus buildings. The caller disconnected the first call with ODUPD and called back at 2:26 a.m.

At approximately 4:56 a.m., ODUPD received another call. During the call, the individual apologized for making an accidental phone call. The dispatcher then contacted the investigating officer about this phone call. ODUPD compared the voice in the threatening phone call to the call received at 4:56 a.m. and determined that the two calls were likely made by the same individual. ODUPD identified the defendant as the caller by using school records provided by the defendant, which listed his phone number.

After identifying the defendant, ODUPD located and interviewed the defendant. During his interview, the defendant acknowledged "I have been around for calls in the past." The defendant later discussed his time spent reviewing swatting calls and videos on YouTube and Twitter. The defendant also acknowledged that he made the call at 4:56 a.m.; however, he did not speak about the actual swatting call.

In response to the swatting call, ODUPD called in every law enforcement officer in the department. ODUPD contacted the Virginia State Police and the Norfolk Police Department to

9

use their K9 officers.    The Norfolk Police Department SWAT Team was put on standby to assist with the response to the threat.    ODU also closed and professors were not permitted to return to the school.    Further, ODU issued a shelter in place for the students on campus and students were not permitted to leave their dorms except to visit the dining facilities.    Law enforcement subsequently searched and cleared every building on the ODU campus.

The conspirators swatted ODU again a few days later.    On December 4, 2018, at approximately 7:03 a.m., ODUPD received another phone call from a blocked number on their non-emergency line.    During the call, the caller stated he was located in the Webb Center, which is a gathering place for students where they can study and eat, and that he was in possession of a 9mm Glock and was going to shoot everyone in the building.    The caller either played a prerecorded swatting event or played excerpts from the prior swatting call made to ODU on November 28, 2018.

In response to this swatting call, ODUPD directed all on duty officers to the Webb Center.    The officers then cleared the building.    A thorough search of the building confirmed that there were no threats.

Even after these two swatting events and law enforcement interviewing the defendant, the defendant remained committed to the conspiracy.    Indeed, just one day after the swatting on December 4, 2018, the defendant entered the Graveyard channel and sought advice from Co-Conspirator 1 on moving the server and using virtual private networks ("VPNs") in the Netherlands for operational security.    Moreover, within a few hours the defendant was also identifying new swatting targets.

Finally, the defendant identified numerous other targets over the course of this

conspiracy.    While law enforcement does not have a complete picture of the defendant's involvement, the defendant's devices provide a small window into his activity.    During a review of one of the defendant's devices, law enforcement identified a group of videos that the defendant created, which document the defendant and other conspirators swatting a barber shop. The defendant recorded the live video feed of the barber shop with the ongoing conversations in the Graveyard channel overlayed on the video.    As the conversation progressed, it appears law enforcement was not responding.    Co-Conspirator 2 then requested new targets.    During the conversation, the defendant offered two potential targets to swat.    The defendant described one of the individuals as a juvenile in Texas and the other individual as an adult in Michigan.    The defendant then provided addresses for both and phone numbers for one of the targets.

In another video, Co-Conspirator 2 and the defendant are looking for individuals to swat on live video feeds located on the website younow.com.    The defendant attempted to identify the college of an individual live streaming from Florida to conduct a swatting call against the individual.    And, in another video, the defendant transitioned to stream.me and identified "cyberdemon531," a gamer who was live streaming her activity, as a swatting target.    The defendant navigated on his computer to a web browser to conduct research and identify "cyberdemon531."    The defendant recorded other videos, which show "cyberdemon531" leaving her live video stream and returning after an extended period.    When she returned, she confirmed to her live video feed followers that she was swatted.

E.   Expert Linguistics Analysis Conducted on the ODU Threat Calls, the Defendant's Accidental Call, and Law Enforcement Interviews

During the ODUPD investigation, ODUPD asked an ODU linguistics professor to conduct an analysis of the caller's voice in the bomb threat call, the defendant's follow-up call,

and the active shooter call.   An ODU linguistics professor compared the three phone calls with law enforcement interviews of the defendant and another individual, who is the defendant's friend, to determine if either individual's voice characteristics matched the voice characteristics of the threat calls.

The professor produced a 43-page report detailing her findings of the quantitative and qualitative measurements.   Based on acoustic analysis of vowel formants and quantitative analysis of pitch data as well as qualitative analysis of consonants from select tokens taken from spectrogram data, the professor determined the following:

- ODU Bomb Threat Calls and the Webb Threat Call contain the same voice;

- The defendant's voice is a match with the Threat Calls; and

- The individual, who is the defendant's friend, is ruled out, *i.e.* is not a match.

The United States Secret Service ("USSS") independently compiled a conglomeration of voice recordings from various threat calls made to law enforcement, which are believed to be part of the broader conspiracy.   The USSS Forensics Services Division ("FSD") conducted a limited cursory analysis with an automatic speaker recognition system test.   FSD supplied a four-page cursory report concluding the amount of speech contained in the recordings was less than the optimal amount for comparison by the automatic system, which could affect the reliability of the report.   FSD concluded the defendant's voice was not a match for any of the threat calls made to law enforcement in this case, including the calls to ODU.

The defendant has denied that he made either call to ODUPD.

F.   Swatting of a Cabinet Member living in Alexandria, Virginia

The conspirators also swatted high profile people.   For instance, on January 27, 2019, at

approximately 2:44 a.m., an individual called the APD non-emergency line and provided an address belonging to a USSS protectee, who was then a United States Cabinet member.   The caller stated he had an AR-15, shot and killed his girlfriend, had her two children tied up in the laundry room and he would kill them if he did not speak to the hostage negotiator, and that he had a pipe bomb that he would detonate.   APD immediately contacted the USSS, who confirmed that the Cabinet member was safe and that APD assistance was not needed.

Law enforcement later determined that this call was placed by Google Voice services using the Google email account jhullxo1000@gmail.com.   This Google email was used in countless other swatting calls associated with this conspiracy.

G. Denton's Swatting of ProPublica and a Journalist

Denton, who as stated above, is a former leader of the Atomwaffen Division in Texas, often expressed his hatred for journalists and media outlets whose articles discussed white nationalist groups and individuals associated with the groups.   Denton was particularly angry with ProPublica and with the Victim, who was a journalist with ProPublica, for reporting on Denton's activities with Atomwaffen Division.   The defendant was aware that Denton wanted to "dox" the Victim and was seeking retribution for the Victim's coverage.   "Doxing" is a harassment tactic that involves researching and publishing personally identifiable information about an individual, such as the person's date of birth, address, telephone number, or other unique identifiers, on the internet.   Personally identifiable information can be obtained in a variety of ways, both legal and illegal.

On or about December 14, 2018, Denton set into motion his plan to seek retribution when he participated in a call made to law enforcement in New York City.   During this swatting call,

a conspirator provided a name and stated that he was affiliated with Atomwaffen Division.   The conspirator stated that he was located at ProPublica's office in New York City.   The conspirator further claimed that he had multiple pipe bombs, an AR 15 rifle, one hostage, and a dead body. The conspirator stated that he would begin shooting at police when they arrived.

In response to this swatting call, the City of New York Police Department ("NYPD") responded to ProPublica's office with approximately a dozen officers.   The initial responding officers determined that the threat did not appear credible.   As a result, the NYPD chose to limit its response to the initial responding officers.   NYPD officers cleared the 13th floor, which is where the purported threat was located.   During the operation, the NYPD found a single employee in the office.   This employee was visibly shaken by the threat and police response.

On or about February 8, 2019, Denton, Co-Conspirator 2, and Co-Conspirator 3 set into motion Denton's retribution against the Victim, when they participated in a call to law enforcement located in Richmond, California.   Co-Conspirator 2 claimed to be the Victim and further stated that he shot his wife, he would shoot any law enforcement officers who responded to the residence and threatened to kill himself.

In response to this swatting call, law enforcement responded to the Victim's home.   Law enforcement removed both the Victim and his wife from their home and placed them in separate police cruisers.   Law enforcement permitted the Victim's young son and another relative to remain in the home.   The Victim explained that he had been receiving threats because he was a journalist and had written about white nationalists.   Law enforcement released the Victim and his wife and let them reenter their home.   The Victim and his family were shaken by these events.

H.  Conspirators Used the DoxBin Site to further Target Individuals

From in and around October 2018, the conspirators also maintained a dark net site known as DoxBin.   The site was a repository of the personally identifiable information of potential and past swatting targets.   The conspirators placing a gun symbol next to the name of a person to indicate that the individual had been swatted.   The DoxBin website primarily targeted government officials, judges, executives, journalists, and celebrities.   The defendant took part in doxing individuals.

II.    The Guideline Range

The defendant has objected inclusion of the three-level and six-level enhancements given under victim related adjustments pursuant to USSG Sections 3A1.1(a) and 3A1.2(a) and (b). The United States will respond to the defendant's objections once it has had an opportunity to review the defendant's sentencing memorandum.

The defendant has also objected to Standard Condition 13 because he asserts the language is so vague as to be without any real limitations on what could trigger a notification requirement and who would have to be notified.   Standard Condition 13 read as follows:

> As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

The defendant claims that Standard Condition 13 improperly delegates to the probation officer authority that rests with the Court.   *See*, *e.g.*, *United States v. Shiraz*, 784 F. App'x 141, 143-44 (4th Cir 2019).

The United States defers to the Court in this matter.   The United States notes, however, that it conducted preliminary research on the contested wording, which has been litigated on

15

several occasions in the Second Circuit.    In two cases, the Second Circuit struck down similar

provisions because they were "vague and afford[ed] too much discretion to the probation

officer."    *United States v. Boles*, 914 F.3d 95, 111 (2d Cir. 2019); *see also United States v.*

*Peterson*, 248 F.3d 79, 86 (2d Cir. 2001) (per curiam) (vacating a district court's imposition of

two similar standard conditions of supervised release, in part, because they, too, gave the

probation officer too much discretion).    The *Boles* court instructed the district court to "clarify

the scope" of the condition.    *Boles*, 914 F.3d at 112.

      In response to the Second Circuit's instruction, the Western District of New York issued

an amended standing order replacing all notification-of-risk conditions for defendants in the

district with the following language:

> *If the court determines* in consultation with your probation officer that, based on
> your criminal record, personal history and characteristics, and the nature and
> circumstances of your offense, you pose a risk of committing further crimes against
> another person (including an organization), the probation officer may require you
> to notify the person about the risk and you must comply with that instruction. The
> probation officer may contact the person and confirm that you have notified the
> person about the risk.

(emphasis added).

      While the United States defers to the Court in this matter and takes no position as to

whether the current language is defective, it does appear that the language adopted in the

Western District of New York addresses the defendant's concerns.    First, this language

obliterates any argument that the Court has impermissibly delegated its authority to the probation

office because the Court has to first conclude that the defendant may pose a risk before the

probation officer may require the defendant to provide notice.    Second, given this sequence, it is

hard to imagine how the defendant would have difficulty complying with the notification

requirement.

III.    Analysis of Sentencing Factors

      In addition to the properly calculated guideline range, this Court is also required to

consider the sentencing factors identified in 18 U.S.C. § 3353(a).   Those factors weigh in favor

of imposing a sentence of 60 months of imprisonment.   Further, should this Court determine

that the properly calculated guideline range is below 51 to 60 months, the sentencing factors

articulated below also counsel for an upward variance in this case.

      A.    The Defendant's Actions Caused Severe Suffering

      First, and most importantly, the defendant's actions caused severe emotional suffering in

our own community and across our country.   The defendant was an active participant in and

hosted the most far-reaching swatting conspiracy in our nation to date.   The defendant and his

conspirators made at least 134 swatting calls across the United States and other nations causing

substantial disruption to government services and severe emotional suffering.

      The defendant and his conspirators victimized universities, schools, places of worship,

and individuals.   In several instances, universities, schools, places of worship, and even a small

community were forced to shelter in place.   The defendant personally targeted his own

university, ODU, and caused his entire campus to shelter in place.   As ODU stated in its victim-

impact letter, the conspirators' actions "resulted in undeniable disruptions to the ODU

community, created anxiety, and traumatized students and their parents as well as resulted in

egregious utilization of university, state, and municipal resources."

      Even more insidiously, the defendant knowingly and actively took part in a conspiracy

that targeted individuals because of their race and religious beliefs.   Let's be clear, the

conspirators committed hate crimes against individuals and a church located a mere mile from this courthouse.

The victim-impact letter written by the Alfred Street Baptist Church conveys the extreme harm caused by conspirators.   In early November 2018, parishioners were forced to shelter in place while law enforcement searched for bombs within their house of worship.   This swatting event has caused lasting harm to parishioners, who knew then and know now that they were targeted because their church is predominately African American.   As the Church stated in their letter, "the bomb threat highlighted the scary reality that many Black and Brown people face every day and paralleled the historical threats against people of color in this nation."   And, that the conspirators "sought to terrorize a community they did not know.   They sought to scar us because of our faith and our race."   Sadly, to this day, parishioners feel less safe and now deal with bag checks and property sweeps.

Nor, was this the only predominantly African American church that was targeted.   To the contrary, on December 28, 2018, the conspirators also swatted the First Reformed Church in Schenectady, New York.   In response to this threat, multiple law enforcement agencies were called in and officers swept inside of the church and searched the surrounding area.

Moreover, on the same day the conspirators called in the bomb threat against the Alfred Street Baptist Church, they also called in a bomb threat against the Dar El-Eman Islamic Center in Arlington, Texas.   On that day, the conspirators claimed to have a bomb and threatened to kill everyone inside the mosque.   In response, law enforcement and fire investigators responded to the mosque where congregants were gathered for a family-night event with the Arlington police.

The above events cover a small portion of the hundreds of swatting calls made in furtherance of this conspiracy.   Almost all these calls, were coordinated in the Graveyard channel hosted by the defendant.   By all accounts, the defendant was a regular participant in the channel and in the swatting calls.   It is therefore imperative that the defendant's sentence reflect the severe emotional harm his actions have caused individuals to suffer in our District and across our nation.

B.     The Defendant's Actions Harmed Society

The defendant through his actions harmed society.   Our nation's history reflects a long struggle to achieve the ideals enshrined in our Constitution.   Along this journey, our nation has, at points, taken steps forward but also steps back.   When Americans target other Americans based on race, religious beliefs, or other individual characteristics, we are *all* harmed.   Such actions, if left unpunished, signal an acceptance that such malevolent conduct is the norm and not the exception.   By knowingly taking an active part in a conspiracy that targeted individuals and institutions for racial and other impermissible reasons, the defendant sought to cause our community to take a step back in its progress towards achieving equality.

The conspirators also disrupted the provision of government resources in countless communities.   In our community, Alexandria deployed its bomb squad and other resources to ensure the safety of the Alfred Street Baptist Church.   Also, in our own District, ODU was forced on two occasions to deploy substantial resources to search and clear buildings.   Further, across our country, countless communities were forced to take similar measures.   For instance, one small community was forced to shelter in place.   And, Grand Rapids, Minnesota, was forced to divert resources from medical calls to support a swatting call placed against Old

19

Central School.

The defendant's sentence therefore must reflect this serious harm that his conduct inflicted on our society.

     C.    <u>The Defendant's Sentence Must Deter Others</u>

Third, and it goes without saying, that this case strongly implicates the need to impose a sentence that will deter others.   First, swatting is increasingly a nationwide problem.   Each year, the number of swatting incidents has increased and in a case in Wichita, Kansas, resulted in a man dying.   Second, the Federal Bureau of Investigation reported in 2019, that hate crimes were at their highest levels in more than a decade.   This conspiracy therefore represents the use of a dangerous means, swatting, to commit a dangerous end, racial violence.   The defendant's sentence therefore must serve as a warning to others that ours is a society of laws and that individuals who engage in dangerous and hateful crimes will receive stiff but fair punishments.

     D.    <u>The Defendant's Sentence Must Avoid Unwarranted Sentencing Disparities</u>

In all cases, it is important that the sentence imposed not result in unwarranted sentencing disparities.   This Court in *United States v. Rust*, 1:17-cr-290, sentenced an Alexandria man to 33 months of imprisonment for posting a threat online to murder African Americans at Howard University.   In *Rust*, the defendant also pleaded guilty to transmitting an interstate threat to injure and faced a maximum punishment of 60 months of incarceration.

The defendant's conduct in this case is more serious for several reasons.   First, the conspirators in this case called law enforcement and issued not one but more than 134 interstate threats to injure.   Second, the defendants caused individual harm when they forced universities, schools, places of worship, and a small community to shelter in place.   And, most importantly,

the conspirators on several occasions targeted individuals based on their race and religious beliefs.   For these reasons, the defendant should receive a higher sentence that the defendant in *Rust*.

IV.   An Upward Departure would be Warranted in this Case

Should this Court conclude that the sentencing guideline range is lower than 51 to 60 months of incarceration, this Court should still impose a sentence of 60 months of incarceration because an upward departure is warranted in this case.

While departures should be rare, this is an atypical case lying outside the "heartland" of conduct covered by the guidelines.   *See* U.S.S.G. Ch.1, Pt.A(1)(4)(b).   The Court may upward depart from the guidelines in several situations, including for reasons articulated in specific guideline provisions.   Here, Application Note 4 to § 2A6.1 states that an upward departure may be warranted in cases with "multiple victims."   The Commission also noted "that offenses covered by this guideline may include a particularly wide range of conduct and that it is not possible to include all of the potentially relevant circumstances in this offense level."   *Id.* And, that the Court may consider "[f]actors not incorporated in the guideline" when "determining whether a departure from the guidelines is warranted."   *Id.*   This is such a case.

Here the guidelines fail to properly account for the sheer breadth of the conspiracy, the number of victims, the extreme emotional suffering caused by the conspirators, the hate crimes committed by the conspirators, and the pecuniary harm suffered by communities across the country.   For these reasons, and other reasons that the United States will articulate in Court, an upward departure would be appropriate in this case.

V.      Conclusion

The United States understands that it is has a responsibility to both the community and the defendant.    The defendant is a young man who has a long future ahead of him.    It is in society and the defendant's interest that he learns from his mistakes, serves his punishment, and grows to become a productive member of our society.    In its duty to strike an appropriate balance, the United States chose to charge the defendant with a crime that has a maximum punishment of 60 months of incarceration.    However, the defendant could have been charged with interstate threats involving explosives, in violation of 18 U.S.C. § 844(e), which carries a maximum punishment of 120 months of imprisonment.    The United States determined that a crime carrying a maximum punishment of 60 months of incarceration strikes the right balance.

Ultimately, it is the Court that is entrusted with determining the appropriate sentence. Considering the seriousness of the defendant's misconduct, a term of 60 months of imprisonment is appropriate.    Such a sentence would account for the harm the defendant caused to universities, schools, communities, and individuals, and send a message to other criminals that threats and hate crimes have no place in our society.

Respectfully submitted,

Raj Parekh
Acting United States Attorney


By:      _____/s/_____
          Carina A. Cuellar
          Assistant United States Attorney

22