**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| | ) | **FILED UNDER SEAL** |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 1:20-cr-82** |
| **v.** | ) | |
| | ) | **Hon. Liam O'Grady** |
| **JOHN WILLIAM KIRBY KELLEY,** | ) | |
| | ) | |
| Defendant. | ) | **Sentencing: March 15, 2021** |

**DEFENSE POSITION ON SENTENCING**

John William Kirby Kelley, who goes by Kirby, was only 17 years old when the offense conduct in this case began, and 18 when it ended now nearly two years ago. Having never been incarcerated before, Mr. Kelley has spent the last 14 months detained at the Alexandria jail, almost entirely during the coronavirus pandemic. No more jail time is necessary in this case. Since his earliest years, Mr. Kelley has been

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████. His parents' divorce had ended with Mr. Kelley's father's disengagement from his two sons. After Mr. Kelley's arrest, his mother moved her family away from northern Virginia to avoid the publicity that came with the arrest and has had only sporadic communication with Mr. Kelley during his 14 months in jail. Now, 20 years old, Mr. Kelley has had to confront the facts of his own conduct and the seriousness of his situation without external supports.

Remarkably, and indicative of Mr. Kelley's likely path forward, he has met these incredibly difficult circumstances calmly and cooperatively.  From the outset, Mr. Kelley expressed a desire to resolve the case by accepting his responsibility.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████  He has been continually engaged with counsel, the mental health staff at the Alexandria Adult Detention Center, the psychologist counsel hired to assist in this case, and the ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████.  The latter has been critical to Mr. Kelley's planning for his future, as at his age he has limited experience living alone and will no doubt encounter obstacles as he adapts to independent living.

Mr. Kelley had long sought refuge from his deficits and social and familial isolation in computers, a subject that consumed his interest since elementary school. He navigated online chat rooms and video games where he could meet similarly interested peers.  His online activities took a dark turn:  The kids—and they were mostly kids—in his online peer group sought power in humiliating others, slinging vile speech back and forth and amusing themselves with the dangerous practice of

---

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

swatting.  Mr. Kelley does not harbor hateful beliefs in real life.  While incarcerated, he has read and engaged with writings about racism and prejudice.  He is hopeful that one day his association with a fringe white supremacist group will not be the first thing people see when they Google his name.  He certainly has the talents and curiosity to rise above this unfortunate chapter in his young life.  For these and the reasons that follow, Mr. Kelley asks this Court to grant him the ability to begin his next chapter, by imposing a time-served sentence and a period of supervision that will enable him to transition successfully to independent living.

Mr. Kelley makes this sentencing request acknowledging that the conspiracy in which he participated was broad and destructive and understandably triggers public outrage.  But punishment is not a zero sum game: The charged conspirators should not be punished to make up for the actions of the uncharged.  For all of the reasons detailed herein, a particularized sentencing in this case accounts for Mr. Kelley's challenges and efforts and allows him—finally—to engage with the appropriate resources.  The government's request that this Court impose the statutory maximum makes no mention of Mr. Kelley and his personal history and characteristics, instead asking this Court to focus exclusively on the offense and to place the entire weight of the conspiracy on Mr. Kelley's young shoulders.  Such an approach neglects the statutory commands of 18 U.S.C. § 3553(a).

## I.  Factual and Procedural History[2]

When Mr. Kelley was 17 years old and a senior in high school, he created an online chatroom channel called Deadnet.org.  The site, which was reachable by typing the URL into the address bar of an internet browser or via a provided link, was a place for Kirby and friends he had met playing video games to "meet up" and chat, the online equivalent of hanging out. ███████████████████████████ ███████████████████████████████████.  He felt he did not fit in at his high school and struggled to find friends.  Instead, he made friends playing video games.[3]  At the beginning, Mr. Kelley and four friends would use Deadnet as a virtual hangout space. The number of friends who had access grew as members invited others to join them. The chatters used monikers instead of their real names:  Mr. Kelley's was "carl."

As Mr. Kelley tells it, friends invited friends to the Deadnet site broadening the group of people who spent time hanging out in the chat room.  The language took

---

[2] Mr. Kelley signed the plea agreement in this case on March 25, 2020, well before any indictment deadline and receiving full discovery.  As a result, the defense is unfamiliar with the factual basis for a number of the assertions in the government's sentencing memorandum, Dkt. No. 39.  For example, in the Affidavit, Dkt. No. 2, the government listed dozens of swatting incidents by police department but without any other identifiers such as dates, times, address targeted, etc.  Although the defense requested more specifics, none were received and certainly none of the underlying factual information, such as police reports or 911 calls, ever was produced.  Thus, the descriptions of specific swatting events in the government's memorandum are new to the defense, which has no way of verifying their accuracy.

[3] Contemporary video games are online and have a social component.  Multiple people can play the same game, and players often form teams or alliances to work together toward a common goal or to work against an adversary.  While playing, gamers often participate in simultaneous chatting about the game, other players, and their lives. Many games come with a chat feature built in, but gamers also may log onto to a separate channel to chat about what they are doing.

on a more hateful tinge.  Several of the site participants espoused white supremacist views.  Mr. Kelley did not push back on this and adopted their language.  It is worth noting that one of the most prolific and poisonous chatters was a teenager from West Virginia, younger than Mr. Kelley.  This individual went by the moniker ▬▬▬▬ and is identified as a co-conspirator in the Affidavit in this case, Dkt. No. 2.  Counsel understands he was not charged federally because of his age.

The group also adopted the dangerous and threatening pastime of swatting various victims.  A member of the group would pick the target, then all would listen in—and sometimes watch if the location had a camera feed the group could access—as one person called in a threat to local law enforcement to provoke a crisis response to the victim's home or business.  This was entertainment for Mr. Kelley and his friends, but, of course, it came with serious risks to the victims and law enforcement.

In the summer of 2018, Mr. Kelley left home for the first time to attend college at Old Dominion University in Norfolk, Virginia.  He had just turned 18 years old in August.  He did not feel ready for college.  He had struggled to interact with his peers while living with his mother and brother in his childhood home.  Now, he would be on his own navigating more rigorous academic coursework and a foreign social environment.  All of this would be hours from home in a place where he knew no one.  His online Deadnet peer group remained intact, however, and Mr. Kelley became more immersed in this virtual world.  That fall, as Mr. Kelley was attempting to adjust to college, new members joined the Deadnet peer group who brought with them more crystallized white supremacist views.  These newcomers, including John

Denton, a co-conspirator whose case also is pending before this Court, *see United States v. Denton*, 1:20-cr-154, were invited by one of the more active Deadnet members, an uncharged co-conspirator in this case. Mr. Denton used the monikers "Rape," "Death" and "Tormentor."

Mr. Kelley suggested the group swat his school, which they did on November 28, 2018, resulting in significant disruption on the ODU campus.[4] Mr. Kelley was so nervous about the incident that he dialed campus police, then hung up. The phone call allowed law enforcement to identify Mr. Kelley as an ODU student and a person of interest. Not long after, they knocked on his dorm room door. During subsequent questioning, Mr. Kelley admitted his involvement with the swatters and consented to a search of his cell phone. Mr. Kelley's peers on Deadnet jibed him for the hang-up call. *See* Affidavit, Dkt. No. 2, ¶ 37. Six days later, the Deadnet group swatted ODU a second time.

The group was prolific. Even before the ODU swatting, the young West Virginia member had selected the Alfred Street Baptist Church in Alexandria, Virginia, as a swatting target. In January 2019, a group member selected the Alexandria home address of ███████████████. Although the latter attempted

---

[4] The government's sentencing memo gives the impression that Mr. Kelley may have been the person who made the threatening call triggering the SWAT response. However, the government omits that ████████████████████████████████ ████████████████████████████ As well, a key link implied between the caller and Mr. Kelley in the Affidavit was just plain wrong: The ODU caller told the dispatcher he took a prescription medication that the Affidavit says was later found in Mr. Kelley's dorm room; in fact, the medication mentioned by the caller was *not* the medication found in Mr. Kelley's dorm room, an error that was never corrected.

swatting was thwarted by the U.S. Secret Service monitoring the official's home, the incident prompted a federal investigation.

Four days later, Mr. Kelley was arrested in his dorm room and charged with possessing hallucinogenic mushrooms, a felony under Virginia law, and soon after expelled from ODU.  The arrest and expulsion in February 2019 sharply changed Mr. Kelley's course.  He returned to his mother and step-father's home in Herndon.

The arrest catalyzed a course correction by Mr. Kelley. He ultimately pled guilty to the felony possession charge, in return for deferred adjudication, and was placed on two years of probation.[5]  Mr. Kelley got a job that he enjoyed working at a pizza restaurant in Fairfax.  PSR ¶ 90.  He performed 100 hours of community service.  PSR ¶ 64.  And, he enrolled in Northern Virginia Community College.  PSR ¶ 88.  Although life in his mother's house was volatile—he was counseled to move out of his mother's home by Fairfax probation, which he did in December 2019—Mr. Kelley passed 2019 uneventfully and otherwise relatively happily.  He had no contact with the Deadnet group since the early spring.[6]  In early December 2019, Mr. Kelley moved in with his maternal uncle, ███████████, who reported that afterwards Mr. Kelley seemed calmer and more engaged with those around him.

---

[5] Counsel does not believe that Mr. Kelley's federal criminal conduct gives rise to a state probation violation allegation, because Mr. Kelley did not begin his state probation until May 22, 2019, after the conduct in the instant case ceased.

[6] The government has said that Mr. Kelley was in contact with members of the Deadnet group until about April 2019.  Mr. Kelley does not deny that, however, he does not recall having substantive involvement with the group after his electronics were seized by the Secret Service in early February 2019.

On January 10, 2020, Mr. Kelley, then 19 years old, was arrested at his uncle's home.  Just two weeks before the first novel coronavirus case would be reported in the U.S., Mr. Kelley was booked into the Alexandria Adult Detention Center.  None of his family members volunteered to house him if he were released on bond, so, with nowhere to go, Mr. Kelley did not seek release at his detention hearing.  *See* Minute Entry, Dkt. No. 10 (Jan. 15, 2020).  He was placed in the mental health unit at the jail and has remained there since.

On March 25, 2020, the parties notified this Court that Mr. Kelley intended to plead guilty pursuant to a plea agreement.  Due to scheduling complications in light of the pandemic, the plea hearing was held on July 21, 2020.  Sentencing is set for March 15, 2021.

## II.    Legal Standard

This Court's primary directive at sentencing is to "impose a sentence sufficient, but *not greater than necessary*, to comply with the purposes" of sentencing—that is, the minimum amount necessary.  18 U.S.C. § 3553(a).  The Sentencing Guidelines are just that, guidelines.  *See United States v. Booker*, 543 U.S. 220, 259-60 (2005).  Moreover, the Guidelines are only one of more than a half-dozen statutory sentencing factors enumerated in 18 U.S.C. § 3553(a) that this Court must take into consideration in fashioning the appropriate sentence.[7]

---

[7] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from

## III.    Sentencing Argument

The defense submits that a time-served sentence of more than 14 months for Mr. Kelley is sufficient to achieve the goals of sentencing for this defendant in this case. Mr. Kelley's conduct occurred just as he turned 18 years old and ended in early 2019. Fourteen months of incarceration is substantial for someone Mr. Kelley's age and with his limitations, and it has left a profound impression on him.

Importantly, Mr. Kelley appreciates the wrongfulness of his actions but also of the hateful way of thinking that his conduct embraced and fostered. He categorically rejects racism and white supremacist views and has been receptive to learning more about how these views harm others. And while Mr. Kelley's deficits and the virtual setting of the chat group made it possible for Mr. Kelley to overlook the potential for violence that is inherent in swatting, he now appreciates how dangerous it was and its impacts on real people. ███████████████████████████████████

███████████████████████████████████████████████████████████████

██████████ This criminal prosecution, however, has disrupted these patterns. It is unmistakably clear to Mr. Kelley now that he must work harder to make these connections and to avoid people who are engaged in negative behaviors.

In furtherance of that effort and in light of his family's unwillingness to help him through this case, ███████████████████████████████████████

████████████████████████████████████████████████████████████.

---

further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

He recognizes that, with his history and diagnoses, his transition to independent living will take commitment and patience on his part, as well as help where he can find it.  Mr. Kelley's participation in planning for his future is indicative of how seriously he is approaching the lessons of this case and working to avoid any future recurrence.  In short, it is evidence that the 14 months Mr. Kelley has served have been a powerful deterrent.  Permitting this 20-year-old young man now to turn toward his future would be just and promote respect for the law.  Mr. Kelley's release will be supervised closely, not just by the U.S. Probation Office for any period of supervised release, ███████████████████████████████████████████████ ██████, which will foster Mr. Kelley's successful transition and bright future.

## A.      The Guidelines calculation in the PSR is improperly inflated.

The correctly calculated offense level in this case is 15, with credit for accepting responsibility.  The PSR includes two victim-related enhancements, under USSG §§ 3A1.1(a) and § 3A1.2(b), that do not properly apply in this case—accounting for 9 points that should not be included in the offense level.    Applying the correctly calculated offense level of 15 results in an advisory Guidelines range of 18 to 24 months.[8]

The government bears the burden of proving the applicability of a sentencing enhancement.  *See, e.g.*, *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014).

---

[8] If only the § 3A1.1(a) enhancement were applied, the total offense level would be 18, and the advisory Guidelines range would be 27 to 33 months.  If only the § 3A1.2(b) enhancement were applied, the total offense level would be 21, and the advisory Guidelines range would be 37 to 46 months.

Should the Court overrule the following objections, the defense nevertheless submits that a variant sentence is appropriate in Mr. Kelley's case.

> ### 1. *The high standard for applying the § 3A1.1 enhancement (hate crime motivation) is not met with respect to Mr. Kelley.*

The defense objects to the application of the USSG § 3A1.1(a) hate crime enhancement in Mr. Kelley's case. The enhancement's language is worded especially narrowly, setting it apart from other enhancements in the Guidelines. Specifically, § 3A1.1(a) requires a finding *beyond a reasonable doubt* that *the defendant* intentionally selected the victims because they belonged to a protected class.[9] There is no evidence in the record that Mr. Kelley selected swatting targets due to their race or any other protected status. The swatting that Mr. Kelley is most closely linked to and known to have chosen was his school, motivated by the desire to avoid class.

The only target that the government has identified as having been racially motivated was the Alfred Street Baptist Church in Alexandria. Although it appears that one of Mr. Kelley's co-conspirators *did* select the Church because he thought it was an "African American church," *see United States v. Denton*, No. 1:20-cr-154, Dkt. No. 2, ¶ 71, the defense is unaware of evidence that Mr. Kelley (or the conspiracy generally) knew of this motivation. Accordingly, the assertions in the statement of facts cannot satisfy the particularly high standard required by § 3A1.1(a).

---

[9] Ordinarily the proponent of a Guidelines enhancement must meet a preponderance of the evidence standard. USSG § 6A1.3 cmt.

11

### 2. The § 3A1.2 enhancement (official victim) should not be applied to Mr. Kelley.

The defense objects to the application of a 6-point enhancement under USSG §
3A1.2.  Although the government has advised that a government official's residence
was the target of an attempted swatting, we are unaware of any evidence showing
that Mr. Kelley knew who lived at that residence or even that the members of the
conspiracy generally knew whose home it was.  Although § 3A1.2 does not contain
the especially high standard that § 3A1.1 does, it does require at the very least that
the defendant *knew* that the victim was a government official and was motivated by
that status.  *See* USSG § 3A1.2(a)(2) (requiring that offense of conviction be motivated
by victim's official status).  Given that it is unclear whether the co-conspirators—
much less Mr. Kelley—knew whose home it was when they committed that swatting,
the conclusion that the person's status was actually a *motivation* for the swatting is
unsupported.

Moreover, the Guideline requires that the "*offense of conviction*" have been
motivated by the victim's official status.  This requirement applies to both the
enhancement's 3-point and 6-point application. The offense of conviction in Mr.
Kelley's is conspiracy to commit interstate threats.  There is no evidence that the
conspiracy was motivated by the status of a victim whose involvement in the offense
did not come into play until months later.

For these reasons, the defense submits that § 3A1.2(a)(2) is not demonstrated
by a preponderance of the evidence in this case and, therefore, neither § 3A1.2(a) nor
(b) applies.

> ### 3. In the alternative, a downward departure is appropriate because the advisory Guidelines range in this case is inflated in a manner that does not fit with Mr. Kelley's conduct.

If the Court overrules the defense's Guidelines objections, then the Guidelines will recommend a sentence at the statutory maximum for Mr. Kelley. Mr. Kelley recognizes that the conduct in this case was serious and risked real danger to unwitting victims and law enforcement. However, Mr. Kelley and Mr. Denton—who are very differ starkly in personality, background and culpability—appear to be the only members of the group who will be held responsible for the actions of the conspiracy because the other members, a number of them at least equally culpable, were minors or located outside the U.S. or both. It is fair that Mr. Kelley be held to account, but he should be held to account for his specific role and culpability. For this reason as well as the others discussed below, this Court should depart downward from the advisory Guidelines range. *See, e.g.*, USSG § 5H1.1 & 1.3 (authorizing downward departures due to mitigating circumstances of defendant's age and mental and emotional conditions); § 5K2.0 (authorizing downward departures for other reasons, such as circumstances not fully taken into account in the Guidelines).

The advisory Guidelines in this case are driven overwhelmingly by the "official victim" enhancement, which accounts for 6 points of a total of 24. Yet, the conspiracy's single attempted swatting of a government official does not merit this central role in determining Mr. Kelley's sentence. First, as recounted above in Section III.A.2, there is no evidence that Mr. Kelley, or any of the conspirators, knew the swatting call was aimed at a government official. Second, as far as the defense is

aware this was the only attempt to swat a government official.  Doing so was not an object of the conspiracy, although it is clear Mr. Kelley and his peers were not that particular as to who their target was.  Third, this swatting actually (fortunately) was unsuccessful.  The defense understands that the Secret Service were called by law enforcement before any emergency response was dispatched and advised that that there was nothing amiss at the home.  No SWAT team was sent.

Additionally, the defense submits that the 3-point hate crime enhancement overweights the advisory Guidelines range for *Mr. Kelley's* conduct.  Mr. Kelley admits that he engaged in hateful speech with his peers in the Deadnet chat, a choice he deeply regrets and that is at odds with Mr. Kelley's actions towards people of other races, creeds, and gender, as his former teachers attest.  *See* Ltr. of John Kelley, attached as Exhibit 1; Ltrs. of Cristian Manoatl & Deborah Kitchell, attached as part of Exhibit 2.  But Mr. Kelley himself did not join this conspiracy with an aim of targeting people based on race or gender (or any other protected class).  Rather, the group's primary target criteria seemed to be knowledge of the person's address and the accessibility of a video feed.  The chat group, made up mostly of teenagers, was prolific in using deeply offensive language, but was not organized around targeting people of a specific race or other characteristic.

The purpose of each enhancement is to provide additional punishment and deterrence to crimes against certain classes of victims.  Mr. Kelley did not select either target, and there is no evidence that Mr. Kelley understood the motivation behind either swatting. Consequently, any enhancement of his sentence based on

these characteristics would be punishing him for mental states he did not have and attempting to deter specific conduct to which he did not contribute.

### 4. The defense objects to the vague and unnecessarily broad proposed Standard Condition of Supervision No. 13.

The defense objects to proposed Standard Condition No. 13 because, as worded, it is breathtakingly broad and, thus, improperly delegates a judicial function to the probation officer. PSR at 18. Standard conditions are laid out in the Sentencing Guidelines, USSG § 5D1.3(c), but are neither statutory nor mandatory. *See* 18 U.S.C. §§ 3563 & 3583 (*not* listing broad notification provision among statutory conditions); *United States v. Booker*, 543 U.S. 220, 259-60 (2005) (Sentencing Guidelines are not mandatory). Moreover, this is not a case that naturally calls for notification of third parties under specific situations, such as a fraud and drug diversion cases often do. That said, to the extent that some kind of notification is deemed necessary, the defense would consider agreeing to a more narrowly tailored requirement.

As worded, however, Standard Condition No. 13 is susceptible to amorphous interpretation: How would someone know what "risks" is meant to mean? What kinds of "risks"? To who? How far is the term "third parties" to be construed? Delegating this broad decision-making power over Mr. Kelley's liberty on supervised release is impermissible. *See, e.g., United States v. Shiraz*, 784 F. App'x 141, 143-44 (4th Cir. 2019) (court's delegation to probation officer of what type of business defendant could operate was improper). Faced with a similar objection in a fraud case—which more commonly would engender a notification condition—Judge Ellis agreed Standard Condition No. 13 was too broad and imposed a narrower notification

15

provision instead. *See United States v. Clark*, No. 1:19-cr-332, Dkt. Nos. 38 & 41 (E.D. Va. Jan. 29, 2021).

**B.** 

**C. Mr. Kelley's personal history and characteristics counsel in favor of a time-served sentence, as well as a term of supervised release with an emphasis on mental health counseling and supportive services.**

> *1. Mr. Kelley's impairments were evident at a very early age, but attempts at treatment were fragmented and negatively impacted by his parents' tumultuous separation and his mother's frequent transience.*







> *2. Mr. Kelley's pre-teenage and early teenage years were marked by escalating conflict with his mother and step-father, and inadequate attempts at holistic treatment.*

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

Despite Mr. Kelley's struggles at home and in school, his intelligence and work ethic helped him graduate on time with a high school diploma in June 2018 and be accepted to attend Old Dominion University. PSR ¶¶ 86-87. Mr. Kelley was anxious about the transition to college, but also hopeful that moving out of his parents' home would help him start a new chapter. Unfortunately, the newfound freedom and Mr. Kelley's discomfort in his new environment led to deepening dependence on his Deadnet peers and experimenting with illegal drugs. PSR ¶¶ 64, 87. When Mr. Kelley returned to Northern Virginia after his expulsion from ODU, he found work at a pizza restaurant and after several months enrolled at Northern Virginia Community College to continue his education. PSR ¶¶ 88, 90.

**3.**





### *4. The release plan developed will guarantee Mr. Kelley's success on supervision and a positive path forward.*

Mr. Kelley has demonstrated prior success with court supervision by complying with all the conditions of his state probation, including negative urine screens and completing community service. PSR ¶ 64. In the current case, the special conditions of federal supervision will appropriately augment the ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ ██ ███████████████████████████████ ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████. The Office of the Federal Public Defender staff also will stay involved to coordinate with the CSB team and U.S. Probation to fill in any gaps in support.

### 5. Despite the struggles he has had in his young life, Mr. Kelley possesses many protective factors that will support a productive transition to the community.

Mr. Kelley has adjusted well to the structured and supportive environment of jail, including active participation in therapy and working as the unit trustee. He has used the experience to learn about himself and his interactions with others, and he looks forward to applying his new skills and confidence in the community.

Lacking traditional family support throughout this experience, Mr. Kelley has worked hard to cobble together a community of support, including reconnecting with his father and grandmother, reaching out to old friends and reconnecting with educational mentors. This group of compassionate and empathetic individuals who have known Mr. Kelley in different contexts consistently describe him as hard-working, respectful and encouraging. *See* Letters of Support, attached as Exhibit 2.

A theme throughout the letters is the promise that Mr. Kelley's future holds as he possesses many skills and traits that will translate into productive and fulfilling employment. His high school teacher, Cristian Manoatl, shares how Mr. Kelley took a special interest in helping other students with disabilities, as he was able to understand and connect with them. Mr. Manoatl poignantly describes Kirby as "a student with humanity, humility, and genuine compassion for others—especially those who are cast aside or not accepted by others." Ltr. of Cristian Manoatl (Exhibit

2).  Mr. Manoatl's fondness for Mr. Kelley was such that he has asked to reconnect with Kirby to help support him as he transitions to the community.  Mr. Kelley looks forward to showing the rest of the world the humble, positive, and caring person that his favorite teacher describes.

> ### D. Application of the 18 U.S.C. § 3553(a) sentencing factors demonstrates that a time-served sentence followed by a period of supervised release with mental health and other support services is a sentence sufficient but not more than necessary under the circumstances of this case.

The § 3553(a) sentencing factors can be achieved through the 14-month sentence Mr. Kelley already has served, as well as a period of supervised release with mental health counseling and other support from the Probation Office and Fairfax CSB, which is prepared to assist Mr. Kelley upon his eventual release.  These services will assist Mr. Kelley in learning to live independently, as all parties agree that is his best path forward and the most likely to capitalize on the lessons that this prosecution has imparted.  Even before his arrest, Mr. Kelley had abandoned the conspiracy and his criminal conduct and was working and re-engaging in college classes.  In short, Mr. Kelley already had made progress on his own before this intervention.  More time in prison will not assist his successful return to society, nor is it needed to provide further deterrence to this young man or others similarly situated.

> #### 1. A time-served sentence of nearly 14 months would constitute adequate deterrence to Mr. Kelley and others.

Before his arrest in this case, Mr. Kelley had never been incarcerated before. His single prior offense—possession of hallucinogenic mushrooms in his college dorm room—occurred contemporaneously with the instant conduct and resulted in a

deferred disposition.  (By all indications Mr. Kelley successfully completed the terms of his probation in that case.)  Mr. Kelley now has spent 14 months in jail and done so during the coronavirus pandemic.  This has been a terrifying and eye-opening experience.  These 14 months have been sufficient to send a grave message to Mr. Kelley about how seriously he must consider the choices he makes, the consequences to others of his actions, and the peers with whom he associates.

This Court need look no further than Mr. Kelley's own conduct to determine that he has been deterred.  For at least nine months before his arrest, Mr. Kelley had been living a law-abiding life, abiding by the terms of his Norfolk probation.    He worked at a Fairfax pizza restaurant.  He completed his court-ordered community service.  He applied for a student loan and enrolled in NOVA.  He did these things on his own, before this prosecution intervened.  The arrest by campus police after the ODU swatting and the later raid on his dorm room by the Secret Service were enough to scare Mr. Kelley to reform his behavior.  Jail time in addition to those events and this felony conviction has added even more heft to that message.  More is not needed.

### 2.  *A sentence of 14 months will act as a deterrent to others* similarly situated *to Mr. Kelley.*

A 14-month sentence in prison and federal felony conviction are substantial enough to deter others similarly situated to Mr. Kelley, that is, others with limited or no experience with the criminal justice system and who are young, have deficits that can make them impressionable and desperate for social acceptance where they can find it, recognize the error of their ways and move on, and are capable of planning productively for their future even without family support.  *See, e.g., Pepper v. United*

*States,* 562 U.S. 476, 488 (2011) (holding that sentencing courts must "ensure[] that the punishment will suit not merely the offense but the individual defendant"). However, the only other co-conspirator charged for the offense conduct, John Cameron Denton, is not similarly situated to Mr. Kelley. As a result, the defense submits that this Court should not treat these two defendants similarly.

First, Mr. Denton is meaningfully older. As the defense understands it, Mr. Denton is now in his late 20s and had held long-term employment in his hometown around the time of this conduct. *See* Motion to Revoke Bond Order, *United States v. Denton*, No. 1:20-cr-154, Dkt. No. 18 at 4-6 (March 25, 2020). Mr. Kelley was barely an adult when this conduct occurred. Second, it appears that Mr. Denton has not faced the same hardships in his upbringing that Mr. Kelley has. For example, Mr. Denton was able to seek a bond citing his large, supportive and well-connected family in Texas who would assist him were he released. *See id.* Mr. Kelley has no such family support. Third, at least to the defense's knowledge gleaned largely from bond pleadings, it appears that Mr. Denton does not have the significant and relevant cognitive deficiencies from which Mr. Kelley suffers. That is, Mr. Denton's hate speech appears rooted largely in ideology, while Mr. Kelley's was a function of his isolation and misguided efforts to fit into this social group. Those who know Mr. Kelley report that he did not express such views to them, but rather was a respectful and kind peer to classmates who looked or thought differently from him. *See* Ltrs. of Cristian Manoatl & Deborah Kitchell (Exhibit 2). Fourth, Mr. Denton apparently was a founding member of Atomwaffen, an online white supremacist group, who was

actively recruiting minors to join the group.  *See* Affidavit, *United States v. Denton*, No. 1:20-cr-154, Dkt. No. 2 ¶ 74.  Although Mr. Kelley was involved in maintaining websites used by some members of that group, Mr. Kelley did not consider himself a member and had no defined role in that group.  Fifth, Mr. Kelley left the Deadnet peer group in April 2019 at the latest and moved on with his life.  Mr. Denton was apparently engaged in white supremacist conduct up until his arrest in February 2020.  *See id*.  The dissimilarity between Mr. Denton and Mr. Kelley is perhaps best illustrated by the monikers each used online:   Mr. Denton went by "Rape," "Tormentor," and "Death."  Mr. Kelley went by "Carl."

For those like Mr. Kelley who face incarceration for the first time at a young age and through the lens of diagnosed deficits, a sentence of 14 months will send a message that hateful and threatening conduct will be punished severely, with a federal felony conviction and a substantial period of jail time.  Even apart from the sentence imposed, federal felony prosecution sends a message that the sort of conduct in which Mr. Kelley and his peers engaged is not simply online role-playing with distant but dissociated targets, but is instead deadly serious with real-life, long-lasting consequences.  Coupled with a sentence of more than a year of incarceration the message will resound to those like Mr. Kelley contemplating similar criminal conduct.

Virtually no empirical data suggests that harsher (lengthier) sentences achieve better general deterrence than moderate sentences.  The Department of Justice itself concedes that longer sentences are minimally correlated to deterrence:  The "*certainty*

of being caught is a *vastly* more powerful deterrent than punishment." *See, e.g.*, Nat'l Instit. of Justice, Five Things About Deterrence (second emphasis added).[10] *See also* Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, at 1 (2010). Findings regarding general deterrence are relatively settled: "[G]eneral deterrence works in the absolute sense: there is *a connection* between criminal sanctions and criminal conduct. However, there is insufficient evidence to support a direct correlation between higher penalties and a reduction in the crime rate. . . ." Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted). In sum, "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime." *Id.* at 1203. So general deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid," which "could be satisfied by a fine or a short prison term." *Id.* at 1205.

In fact, research has found that longer sentences may, in fact, be counter-productive. *See* DOJ, Five Things About Deterrence, *supra*. In Mr. Kelley's case, his deficits may be compounded by a longer period of imprisonment in the BOP, which almost certainly would put him in an even harsher and potentially traumatizing environment than the Alexandria jail. *See* Boyd Report at 22-23.

---

[10] Available online at <https://nij.ojp.gov/topics/articles/five-things-about-deterrence>. The National Institute of Justice is the research and development agency of the DOJ. *See* About NIJ, available online at <https://nij.ojp.gov/about-nij>.

### 3. The need to reflect the seriousness of the offense, promote respect for the law, and provide for just punishment.

Mr. Kelley is not asking to escape punishment.  He recognizes that his conduct caused real harms to individuals as a result of the trauma and force that resulted from SWAT deployments to target residences and businesses.  The defense submits, though, that 14 months incarcerated followed by a period of supervision is *sufficient* punishment under the circumstances.

Just punishment need not be achieved strictly through jail time.  Indeed, § 3553(a) directs courts to consider alternatives to imprisonment.  *See* 18 U.S.C. § 3553(a)(3) (instructing courts to consider "the kinds of sentences available").  A period of supervised release is a significant sanction, too, because of its impingement on an individual's liberty.  *See Gall v. United States*, 552 U.S. 38, 44, 48 (2007) (supervision is a "substantial restriction of freedom").  *See also* 18 U.S.C. § 3583(d) (listing conditions of supervised release).  Mr. Kelley also will owe restitution to ODU, as he has agreed, an additional sanction certainly not contemplated by him—or probably any of his peers—when concocting their swatting scheme.  Additionally, the felony conviction carries collateral consequences that will follow Mr. Kelley for the rest of his life.

Further, any just sentence should take into consideration the conditions of incarceration created by the coronavirus pandemic, under which Mr. Kelley has served for a year now and which do not promise to subside for months to come, despite the arrival of vaccines.  The Alexandria jail has made extensive use of lockdowns— when inmates are confined to their cells for up to 24 hours a day for days at a time—

28

to control infection.  Mr. Kelley reports his unit has been under lockdown for about two months during which he has been allowed out of his cell twice a day for three hours total.  Educational and treatment programs at the jail were suspended in March 2020 and remain so.  Contact with family and friends has been limited to phone calls and the recent addition of very brief video calls.  Mr. Kelley has had to engage in his criminal case almost entirely through brief videoconferences and telephone calls with his lawyer, a consequence of the pandemic that requires a defendant to trust more than usual in his counsel.  Yet, even under these constrained conditions, Mr. Kelley has been engaged and cooperative.

### 4. *Respect for the law requires tempering incarceration with other sentencing considerations, including rehabilitation.*

The criminal justice system does not earn respect only by imposing punitive sentences of incarceration. Rather, that the system can recognize the underlying causes of a person's misconduct and help that person address those causes—in lieu of just locking him up—is at least as likely to engender respect.  This is because doing so demonstrates a commitment to recognizing the unique circumstances of each individual and acting to avoid future criminality, stated goals of sentencing.  *See* 18 U.S.C. § 3553(a)(1) & (2)(B)-(C).

In this case, a time-served sentence would foster Mr. Kelley's success.  It would avoid his transfer to the BOP, which poses health risks due to the ongoing pandemic and more long-term traumatic risks due to Kirby's age and vulnerabilities.  Releasing Mr. Kelley at this juncture also would allow support services to step in at a time when he is in a relatively healthy and positive place.  *See* Ltr. of John Kelley ("If I had the

insight and support I do now . . ."), attached as Exhibit 1.  His 14 months at the Alexandria jail have been in the mental health unit, a small unit where he benefitted from the low inmate population and had the ability to see a counselor occasionally. Mr. Kelley and undersigned counsel have been working with the Fairfax CSB as described above in Section III.C.4 to secure support services to assist his transition. Although the timing of Mr. Kelley's release does not necessarily affect the availability of these services, they would dovetail well with what counseling he has received at the jail, his cooperative and supportive relationship with counsel, and the positive outlook he has maintained despite his circumstances.

In the months after Mr. Kelley was expelled from ODU, he picked himself up and demonstrated that he can be productive and manage multiple responsibilities. He held a job, applied for and received financial aid for college, began taking classes at NOVA, and completed the 100 hours of community service required by his Norfolk probation.  This is a promising start for a young man who has had to overcome significant hurdles since his earliest years.  He has now been sufficiently punished for his criminal conduct, but that punishment has not yet derailed the progress he had begun to make.  A sentence of time-served would allow Mr. Kelley to take the lessons he has learned and now turn his focus to his future under careful supervision.

## IV.      CONCLUSION

Accordingly, the defense respectfully asks that this Court impose a sentence of time served and a period of supervised release with mental health counseling.

Respectfully submitted,

JOHN WILLIAM KIRBY KELLEY

30

By counsel,

Geremy C. Kamens
Federal Public Defender

By: _____/s/_____
Cadence A. Mertz
Va. Bar No. 89750
Nathaniel Wenstrup
Admitted *pro hac vice*
Assistant Federal Public Defenders
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
703-600-0800
703-600-0880 (fax)
Cadence_Mertz@fd.org

## **CERTIFICATE OF SERVICE**

 I hereby certify that on this 9th day of March, 2021, I will file the foregoing using the CM/ECF system, which will serve copies on counsel of record.

_____/s/_____
Nathaniel Wenstrup
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
703-600-0800
703-600-0880 (fax)
Nate_Wenstrup@fd.org

31