UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**UNITED STATES OF AMERICA**          :
                                      :
              **Plaintiff,**          :    Criminal Action
                                      :    No. 1:20-cr-82
**v.**                                :
                                      :
**JOHN WILLIAM KIRBY KELLEY,**        :    March 15, 2021
                                      :    9:00 a.m.
                                      :
                                      :
              **Defendant.**          :    Washington, D.C.
                                      :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . :


**TRANSCRIPT OF SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE LIAM O'GRADY,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

  For the United States:        **Carina Cuellar, Assistant U.S.**
                                **Attorney**
                                US Attorney's Office
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                703-299-3700
                                Email: Carina.cuellar@usdoj.gov


  For the Defendant:            **Cadence Mertz, Assistant Federal**
                                **Public Defender**
                                Office of the Federal Public
                                Defender (Alexandria)
                                1650 King Street, Suite 500
                                Alexandria, VA 22314
                                703-600-0800
                                Email: Cadence_mertz@fd.org

                                **Nathaniel Wenstrup, Assistant**
                                **Federal Public Defender**
                                Office of the Federal Public
                                Defender (Alexandria)
                                1650 King Street, Suite 500
                                Alexandria, VA 22314
                                703-600-0800
                                Email: Nate_wenstrup@fd.org

```
APPEARANCES:  (Cont.)

Court Reporter:               Scott L. Wallace, RDR, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             401 Courthouse Square
                             Alexandria, VA  2231-5798
                             Cell: 202-277-3739
                             Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

1          <u>**MORNING SESSION, MARCH 15, 2021**</u>

2    (9:08 a.m.)

3          THE COURTROOM CLERK:  The Court calls *United States of*

4    *America versus John William Kirby Kelley*, Case Number 2020-cr-82.

5          May I have appearances, please, first for the government.

6          MS. CUELLAR:  Good morning, Your Honor.  Carina Cuellar on

7    behalf of the United States.

8          THE COURT:  All right.  Good morning to you.  Welcome

9    back, Ms. Cuellar.

10          MS. CUELLAR:  Thank you, Your Honor.

11          MS. MERTZ:  Good morning, Your Honor.  Cadence Mertz and

12    Nathaniel Wenstrup on behalf of Mr. Kelley, who is present.

13          THE COURT:  All right.  Good morning to you both, and good

14    morning, Mr. Kelley.

15          THE DEFENDANT:  Good morning, Your Honor.

16          THE COURT:  All right.  This comes on for sentencing.  Are

17    the parties ready to proceed?

18          MS. CUELLAR:  Yes, Your Honor.

19          MS. MERTZ:  Yes, Your Honor.

20          THE COURT:  All right.  Let's start with the objections to

21    the calculation of the Sentencing Guidelines.  And, Ms. Mertz,

22    you have objected to the enhancement under 3A1.1(a) for the hate

23    crime motivation, and also 3A1.2(a), that the conspiracy targeted

24    government officials, among others.

25          There's one other objection, and that's to the language in

1    the special conditions, the number 13, and I think that the --

2    and I'll hear any argument that you have on that, but I think the

3    government's response in adding the words "if the Court

4    determines in consultation" is an appropriate revision to narrow

5    the authority of the probation officer.

6         Please, go ahead.  I'll hear anything else that you would

7    like to say now.

8         MS. MERTZ:  Thank you, Your Honor.  Your Honor, just

9    briefly.  We would agree with the revisions to the standard

10   condition 13.  Our concern there is only the breadth as it was

11   worded.

12        THE COURT:  All right.

13        MS. MERTZ:  Your Honor, originally we had actually

14   intended to rest on our papers on these objections to the

15   Guidelines.  However, in light of the government's supplement, I

16   just briefly wanted to respond.  We are making legal arguments,

17   legal-based objections to the Guidelines based on the particular

18   wording and requirements for each.

19        So, 3A1.1, the hate crime enhancement, requires a very

20   high level of proof, much higher than what is seen normally in

21   other enhancements in the Guidelines, and our point is simply

22   that that level of proof has not been demonstrated here.  It's a

23   beyond a reasonable doubt standard with respect to the defendant.

24        Your Honor, this is a case where Mr. Kelley agreed to

25   plead guilty to a charge very early, and for that reason we did

1   not receive the kind of discovery we might have had had we gotten

2   closer to trial.  Many of the arguments the government has made

3   are based on facts that aren't -- we have not been provided with.

4        That said, our point is simply that the standard for 3A1.1

5   is extremely high and has not been met with respect to

6   Mr. Kelley.

7        And secondly, with respect to 3A1.2, again, we would just

8   cite a lack of evidence.  The DoxBin site or list that is

9   referred to we have not seen, and the requirement in that

10  Guideline is that the person's official status be the motivation

11  for the offense, and we submit simply that that is not shown

12  here, that the one government official that we know about, there

13  was an attempted swatting.  We learned the identity of that

14  person much, much later, more than a year later.  We simply

15  haven't seen that that was the motivation for this conspiracy.

16       THE COURT:  Well, are you asking for a continuance so that

17  you can get the additional information?  I'm not quite sure -- I

18  mean, the case has obviously been around for quite a while, and I

19  don't -- Mr. Kelley -- we went over in detail at his plea

20  colloquy the Statement of Facts and the criminal information, and

21  that information is contained in each of those documents, so

22  I'm -- if you want a continuance to do further research on the

23  issue, I certainly will give you that opportunity to do that,

24  but, otherwise, we're both in a position where we're looking at

25  the papers and information that's been agreed to and then, of

1    course, your conversations with your client that are

2    confidential.  So tell me what you would like.

3         MS. MERTZ:  Your Honor, we're not asking for a

4    continuance.  We think that there's ample information in the

5    record for the Court to go forward with sentencing today.  We

6    would simply submit that the government has not met its burden on

7    either of these.

8         THE COURT:  All right.  Thank you, Ms. Mertz.  All right,

9    Ms. Cuellar.

10        MS. CUELLAR:  Your Honor, for the reasons in the paper

11   that we filed, both papers, the initial paper and the

12   supplemental paper over the weekend, we do think that we've met

13   our burden.

14        I'll start with the easiest one first, which is the

15   official position.  As we pointed out in our paper, both the

16   criminal information and the Statement of Facts refer to DoxBin

17   and exactly who was being targeted in DoxBin.  One of the things

18   put there was government officials.

19        As we -- we have also, I believe, provided in discovery

20   when we spoke with them -- I can put the agent on the witness

21   stand.  After the co-conspirators successfully doxxed one of

22   these individuals, they also placed a gun next to the name of the

23   individual.

24        So, certainly by a preponderance of the evidence, if you

25   look at the court filings, which the United States took pains not

1    to refer to any information not in the record, you have a group

2    of co-conspirators who are maintaining this DoxBin site.  The

3    defendant was familiar with this site and doxxed individuals.

4    The purpose of the site was not to dox unknown individuals, but

5    to dox government officials, celebrities, other people who are

6    prominent in our society.

7        It's simply beyond belief to think that they accidentally

8    found this individual's address in Old Town who happened to be a

9    sitting U.S. cabinet member and doxxed this person not knowing

10   who this individual was.

11       So, I think the -- we have met that both factually and

12   legally, that burden, simply on the filing of the papers.

13       As to the hate crime enhancement, ultimately I won't go

14   over again everything that's in the filing, but ultimately here

15   what you have is a defendant who was part of a conspiracy that

16   targeted individuals.  Some of these individuals were targeted

17   for racial or religious reasons.  The defendant agreed that that

18   was the motivation that he knew of in the filed paperwork.  And

19   it is not the -- the facts before the Court are that the

20   defendant continued to be a part of this conspiracy knowing that

21   this was one of the motivations.

22       Further, and we can -- I will get more into this when we

23   discuss the differences we have with how we view this conspiracy

24   between the two parties.  The defendant was an important member

25   of the conspiracy.  He is the one that hosted the channel.  He's

1    the one that's hosting the channel where the co-conspirators are

2    actually engaging in the conspiracy together, where they are

3    talking about and choosing targets, and the records -- the

4    defense has the records.  He is in there almost daily.  And for

5    co-conspirator 3 and Mr. Denton, he knew these individuals before

6    they joined this conspiracy.

7         So, with Mr. Denton, he actually met him online in Discord

8    in a chat devoted to white supremacists' views which, again, is

9    Constitutionally protected.  The issue here -- he's not being

10   prosecuted for that or for his views; the issue is, was he

11   knowingly a part of and continuing to be a part of a conspiracy

12   that was targeting individuals for racial reasons?  And the facts

13   before this Court in the actual plea documents are "absolutely."

14   He continued to be a part of that conspiracy knowing that.  And

15   even though we disagree with some of the things the defendant

16   wrote in his letter to the Court, in his letter to the Court the

17   defendant acknowledged that he knew his co-conspirators were

18   targeting people for these racial reasons.

19        Now, he said he didn't agree with it, and we can deal with

20   that separately, but he acknowledged that he knew his

21   co-conspirators were targeting people in his very own letter.

22   So, in his own words to this Court, he was knowingly a member of

23   a conspiracy that was committing hate crimes, Your Honor.

24        THE COURT:  All right.  Thank you.  Well, I'm -- I think

25   both of the enhancements apply in the case, and, as Ms. Mertz

1   pointed out, the hate crime motivation under 3A1.1(a) requires

2   that the Court find beyond a reasonable doubt that the object of

3   the -- an object of the conspiracy was to target persons for

4   racial animus, and the facts are uncontroverted, and Mr. Kelley

5   has admitted in the Statement of Facts and as detailed in the

6   criminal information that this conspiracy did exactly that.

7        And moreover, as Ms. Cuellar has just pointed out, he had

8   conversations with Mr. Denton and one of the other

9   co-conspirators about their racist views, and he was somebody

10  that was trusted by Mr. Denton because he appeared to agree with

11  him during the course of the conspiracy, and clearly the Baptist

12  church here in Old Town that was targeted was a reflection of a

13  racial animus.

14       There was also an Islamic center and another church

15  targeted, and these, as the facts reflect that I'm aware of, the

16  group, when they chatted about who their next target would be,

17  co-conspirators 1 and 2, who were from out of the country, were

18  seeking help in selecting the next target to be swatted.

19       And so the -- there was no randomness to this.  It was an

20  attempt to get notoriety.  The ProPublica swatting, all

21  indications were, and the facts of this case are clear, that they

22  carefully chose this, you know, 134 different targets, and did so

23  knowingly, and that, as I indicated, in the Statement of Facts

24  Mr. Kelley admits that in paragraph 10 the defendant was aware

25  that some co-conspirators chose individuals or locations to swat

1   based on racial animus.

2        In particular, the defendant was aware that Denton,

3   co-conspirator 2, and co-conspirator 3, expressed white

4   supremacist views.  The defendant communicated with these

5   individuals about their white supremacist views and used racial

6   epithets.  And, of course, some of those were detailed in the

7   government's position.  So, I find that the facts demonstrate

8   beyond a reasonable doubt that there was hate crime motivation

9   for the racist views.

10       And as to the government official, there's just, for the

11  reasons I've already stated, but it's absolutely clear that this

12  cabinet member was targeted on DoxBin and that the -- again, the

13  Statement of Facts in paragraph 21 states, "From in and around

14  October of 2018, conspirators maintained a dark net site known as

15  DoxBin.  The site was a repository of the personally identifiable

16  information of potential and past swatting targets.  The

17  conspirators indicated on DoxBin that an individual had been

18  swatted by placing a gun symbol next to the name of the person

19  swatted.  The DoxBin website primarily targeted government

20  officials, executives, journalists and celebrities."  The

21  defendant took part in doxxing individuals, so under the

22  preponderance of the evidence standard and the facts surrounding

23  the cabinet members being swatted, I find that the application of

24  3A1.2(a) applies.

25       Ms. Mertz, are there other objections to the Guideline

1   calculation?

2         MS. MERTZ:  No, Your Honor.

3         THE COURT:  All right.  Then I'm -- your exception is

4   noted.  Of course, I'm not going to modify the Guideline

5   calculation, and, after acceptance of responsibility, the offense

6   level of -- is it 24?  Mr. Kelley's a criminal history

7   Category 1.  The Guideline range then is 51 to 60 months, one to

8   three years of supervised release, and a possible fine.

9         Ms. Mertz, are there other corrections, additions that you

10  propose to be made to the presentence report?

11        MS. MERTZ:  No, Your Honor.  I would just note that we

12  will still be asking for a variance sentence.

13        THE COURT:  Right.  I understand.

14        Mr. Kelley, did you read the presentence report, sir?  You

15  can remain seated.

16        THE DEFENDANT:  Yes, I have, Your Honor.

17        THE COURT:  Do you have any other additions or corrections

18  that you want to make to any of the information in the report?

19        THE DEFENDANT:  No.

20        THE COURT:  All right.  Thank you, sir.  I'll file the

21  report without amendment.  I've read the parties' submissions,

22  and, Ms. Cuellar, I'll hear anything that you would like to say

23  on sentencing.

24        MS. CUELLAR:  Your Honor, every case that comes before

25  this Court is quite serious, and many of these cases involve

1    victims.  I think very few involve this many victims, and,

2    thankfully, even fewer involve victims who have been targeted for

3    racial reasons.  So this case is very serious, and the

4    Guidelines, I think, reflect that seriousness, and we are asking

5    for 60 months, which is at the high end of the Guideline range.

6    For the reasons articulated in our papers, the harm to the

7    victims, the harm that's actually done to society by this type of

8    conduct, the need for deterrence, and the need to avoid

9    unwarranted sentencing disparities, all counsel for the 60

10   months.

11        Now, one of these victims is just down the road from here,

12   approximately a mile, and the members of that church are still

13   living with the aftereffects.  As you read in the Victim Impact

14   Statement, they deal with bad checks, they deal with security

15   checks from what happened that Saturday evening in November of

16   2018 when they all huddled in place while the Alexandria Police

17   Department swept their church for bombs.  The Islamic Center as

18   well.  A bomb threat was called in to them.  Thankfully, that

19   evening there was actually a community center get-together with

20   the police, so the police were actually there that evening when

21   the bomb call was called in.

22        But rather than restate what's in our paper, I would

23   simply like to address the different way we believe the facts

24   bear out what this conspiracy was, as opposed to what the

25   defendant presented in their paper.  And I think there's a

1    difference with not only how we view the conspiracy, but the

2    defendant's role in the conspiracy.

3          My takeaway when I read the paper is that the defendant

4    had a chat online and then some people kind of came in, took it

5    over, and because of his disability and his desire to have

6    friends, he didn't stand up, but he wasn't really a part of it.

7    That's the impression that the United States got from reading

8    that paper.  And the facts that are, quite frankly, in the filed

9    documents show that that's not the case.

10         So, the defendant was interacting with Mr. Denton before

11   this conspiracy started in a white supremacist chat room on

12   Discord, and he was friends with co-conspirator 3.  He actually

13   drove out in a Vespa to West Virginia to meet with co-conspirator

14   3.  He knew these individuals' motivations.  And the swatting

15   started before Mr. Denton ever came into that chat room.  And

16   some of it, no doubt, was for humor or because it was funny.

17   They did often regularly target individuals who were so-called

18   online gamers because they videoed themselves as they played

19   games with the desire to see what would be law enforcement's

20   response to the swatting, but it is not the case that this

21   conspiracy took a dark turn and the defendant kind of stood by

22   while more powerful people were doing things he didn't support.

23   He was there when this was going on for quite some time, and he

24   was there when they were choosing targets, and he knew the

25   various motivations, and he was the host of the chat room.  I

1    think what is quite telling is, after his university was swatted

2    and he was talked to by the police -- and I think there's a

3    slight difference here.  The defendant's filing says he spoke to

4    the police about his role in the swatting.  He didn't actually at

5    the time.  He spoke about he's familiar with swatting and he has

6    seen swatting.  He did not speak about any role he particularly

7    had with the ODU swatting that evening.  That was something we

8    had to piece together through the federal investigation.

9         He came back after the second swatting event, so ODU had

10   to be locked in place twice.  It was swatted in a very short

11   period, and you have a victim impact letter from them.  And he

12   comes back into that chat room on December 5th, and he talks

13   about, "Let's get a VPN going through the Netherlands."  And, of

14   course, I think the Court is well-familiar with the fact that a

15   VPN can hide your true IP address, which can make it harder for

16   law enforcement to locate who's involved in a conspiracy.

17        So the response -- at this point many swatting events

18   occurred, many serious ones:  Alpha Street Baptist Church.  The

19   Islamic Center happened.  The response is to double down and

20   protect the conspiracy.

21        So, the facts show that this young man was not overpowered

22   by these individuals.  He was a committed member of this

23   conspiracy, and I think that's the main issue to keep in mind

24   when you evaluate whether 51 to 60 months is appropriate.

25   There's simply nothing in this particular case that counsels for

1    anything but a Guideline sentence.

2         This is quite a serious case.  It is outside of the norm

3    of even the most serious cases that come to this Court.  And we

4    fully agree that the defendant is a young man, that he has a long

5    future ahead of him.  We hope he can grow from this and that he

6    receives the support he needs that, quite frankly, it does not

7    seem he has received in his childhood growing up.

8         And our attempt -- the United States' attempt to balance

9    those equities is to charge him with a crime with a five-year

10   maximum sentence.

11        Now, ultimately, it's not the United States that is

12   entrusted with determining and balancing the equities, it's this

13   Court, and so I simply put to you, Your Honor, that considering

14   how serious this case is, the breadth, the number of victims, and

15   the fact that victims were targeted for racial reasons, that this

16   is a case that calls for serious punishment for both justice for

17   the victims, but also to deter others in this country from

18   engaging in swatting which is an issue of itself, and the

19   resources and the harm that it causes -- a small community in

20   this country even sheltered in place when one of these threats

21   was called in -- but also to send a message that targeting people

22   for racial reasons is simply unacceptable and will be punished by

23   the courts in this country.  Thank you, Your Honor.

24        THE COURT:  All right.  Thank you, Ms. Cuellar.  All

25   right, Ms. Mertz.

1          MS. MERTZ:  Thank you, Your Honor.  Your Honor, in *Pepper*

2     *v. United States,* the Supreme Court made crystal clear that the

3     Court at sentencing has to consider the individual before it, and

4     that that is one of the key considerations.  Who is this person?

5     What are their characteristics?  What is their background?  It is

6     critical to remember that when Mr. Kelley created the chat room

7     that he has fully acknowledged that he created and fully admitted

8     his involvement in what it became, it took a dark turn with him

9     at the helm, and he agrees with that, but he was 17 years old

10    when this chat room was created, when he created it, and he was

11    18 during the conduct that is at issue here.  In fact, he turned

12    18 while the conduct at issue here was going on.

13         When his participation in this conspiracy ended, he was

14    still only 18.  Not only is he 18 -- was he 18 at the time, he

15    has -- he has been diagnosed since four years old with

16    significant deficits.  These do impair his ability to recognize

17    how something that he does will harm others.  What's important

18    here is that this prosecution, this federal felony prosecution

19    has been able to demonstrate for him unmistakably that he needs

20    to make those connections, he needs to see how what he does, even

21    if he thinks it's a joke and he's laughing with his friends, how

22    it can impact other people.

23         At 17 years old, he created this Website.  The other

24    people, most of them also minors who were involved in this, will

25    never stand before this Court.  The only other person, to the

1   defense's knowledge, who will stand before this Court is

2   Mr. Denton.  Mr. Denton and Mr. Kelley are not at all similarly

3   situated.  As we explained in our papers in some detail, the

4   government's -- the sentence that the government asks for would

5   put them on an even footing.  There would be no way for this

6   Court to distinguish between Mr. Kelley at the age of 17 and 18

7   involved in this and Mr. Denton who was an adult with a job and a

8   totally different upbringing, from what we've been able to gleam.

9        This Court has to see Mr. Kelley for who he is, and we

10  would submit that the government's request, sentence, does not do

11  that, that it ignores the many challenges that Mr. Kelley has

12  overcome and the -- his age at the time of this conduct and the

13  strides that he has made since that time, and we -- those strides

14  are the best evidence that this Court has that the time that he

15  has spent in custody, already 14 months, more than a year, very

16  significant period of time, is sufficient in Mr. Kelley's case

17  for his conduct.

18       After he left the conspiracy in the spring of 2019, he

19  returned to this area and got a job and went back to school.  He

20  had to leave ODU.  He didn't want to go to ODU in the first

21  place, but his mother essentially gave him no choice.  He knew

22  that going to ODU, frankly, would be difficult for him and

23  obviously it was.  But he came back here and he got himself on

24  track.  Not withstanding his challenges, he got himself on track,

25  and he performed the community service he had been ordered to do

1   by the Norfolk Court.  He reported to his probation officer, and,

2   by all appearances, it appears that he did everything that he was

3   supposed to do on probation.

4        So, he has shown this Court that these interventions have

5   worked for him and that more jail time is not necessary in his

6   case.

7        Fourteen months, particularly for Mr. Kelley, but for

8   anybody, is a significant period of imprisonment.  That's true

9   under any conditions, but for Mr. Kelley those 14 months have

10  been in the time of the global pandemic, and that has made

11  imprisonment even harder for every inmate.  It's had significant

12  consequences for the conditions of confinement:  No visits;

13  attorney relationship is based almost entirely on phone calls,

14  very brief phone calls and brief video conferences; lock downs,

15  extensive lock downs; and the lack of any kind of really

16  diverting programs that can focus energy elsewhere.  What

17  Mr. Kelley has done is gotten a job in his unit, he's been

18  reading books, as many books as he can get from the library cart

19  that comes around, and tried to learn from this experience.

20       He's been -- he has made absolutely clear to us, his

21  defense, his lawyers, and others from our office, he has made

22  crystal clear that these views that he expressed which are

23  hateful and vile are not who he is.  In fact, his teachers have

24  written letters saying that all of their interactions with him

25  showed him not to be that person and that he has always been

1   welcoming of others and people who are different from him and

2   people who have had challenges like he has had.  Your Honor, he

3   categorically rejects the views that he expressed in those chat

4   rooms, and he has shown this Court that he has learned

5   significantly.

6          It is additionally telling of Mr. Kelley's character and

7   growth that he has managed to spend the last 14 months

8   productively engaged in this case with the Fairfax CSB, which we

9   hope will be able to provide services to him when he gets out,

10  and that he has kept his head up.  The counselor who he meets

11  with at the jail reports that he has been productive and really

12  engaged in trying to move forward, to learn from this.  He comes

13  to their meetings with notes prepared to get the most out of them

14  that he can.

15         Your Honor, we submit that a sentence of 60 months, the

16  statutory maximum, is simply far more than is necessary in this

17  case; that the 14 months that Mr. Kelley already has served is

18  sufficient for him.  It will be followed, no doubt, by a lengthy

19  period of supervised release, and Mr. Kelley would -- will be

20  involved with the Fairfax Community Services Board, we expect,

21  which would also be helping him.

22         Your Honor, Mr. Kelley has not had any family support,

23  really, through this process, which is difficult at an older age

24  but even more difficult when you're 19 and you're arrested.  His

25  friend, Brett, who submitted a letter to the Court, is here

1   today, but Mr. Kelley has done a lot with the little support that

2   he has, and we would ask the Court to sentence him to a sentence

3   of 14 months and a period of supervised release.

4        Your Honor, whatever sentence the Court does impose, I

5   would like afterwards to address how the sentence is imposed, if

6   I may.

7        THE COURT:  Okay.  All right.  Thank you, Ms. Mertz.

8   Mr. Kelley, this is your opportunity to tell me anything that you

9   would like to before I sentence you, sir.

10        THE DEFENDANT:  All right.

11        THE COURT:  Please, go ahead.  You can take your mask

12   down.

13        THE DEFENDANT:  All right.

14        THE COURT:  You can sit, if you would like to make sure I

15   can hear you.

16        THE DEFENDANT:  All right.  Thank you, Your Honor.  I

17   understand the severity of the situation and know now that it

18   isn't a game.  Ever since I left the group in 2019, I deeply

19   regretted the mistakes that I made.  The racial language that's

20   been expressed by me and my co-conspirators, along with the

21   swatting attacks, do not represent my values and beliefs.

22        Furthermore, I was personally disgusted by the direction

23   that the chat room took after my departure and made it a personal

24   mission to improve and separate myself from bad influences such

25   as these.  I've also read the letters from the victims and

1    reflected on their experiences.  To them, I would like to

2    apologize for the losses and hardships experienced by these

3    swats.  Nobody should have to have gone through that, and I am

4    really sorry for what I have done.

5         Finally, I would like to address the period of

6    incarceration that I have gone through.  Because of COVID-19, the

7    jail has been on quarantine lockdown.  There's been no gym

8    programs or real visits since last year.  I've tried -- I have

9    also tried to attend the self-care to the best of my ability;

10   however, the jail's barbershop has been closed to my unit since

11   November.  It has been really challenging to deal with this

12   constant -- um, this constant isolation mentally.  I'm locked in

13   my cell 21 hours a day and rarely get to have meaningful

14   conversations with people because of the isolation.  This has

15   made my social anxiety worse, and I felt more depressed recently.

16   I can't sleep most nights, and I get panic attacks a lot.

17        As of today, my unit has been on heavy restrictions for 70

18   days.  Even with all of this, I've tried my best to improve.

19   I've stayed out of trouble even before incarceration and complied

20   with state probation.

21        Your Honor, I'm really trying my best, and I hope to

22   return to the community as a better man.  Therefore, I ask that

23   the courts not only consider my conduct, my background, and all

24   required factors into consideration, but the hardships that I

25   have overcome in custody during a vulnerable period until its

1   final judgment.  Thank you, Your Honor.

2        THE COURT:  All right.  Thank you, Mr. Kelley.  And I hope

3   you wake up every morning and repeat what you just said to me and

4   to yourself and say I'm going to be -- this is another day where

5   I'm going to work at being a better person and living a better

6   life and serving your community.  You're a bright young man.

7   You're capable of doing exactly that.  Your computer skills are

8   sophisticated, and if you -- it looks to me like you would be

9   interested in a career in computer-related technologies, and you

10  would likely have great success.  So your future is very

11  promising.  The fact that you went back to school and started

12  classes at Nova was encouraging.  The fact that you recognize the

13  harm that you had caused early and came in and pled guilty and

14  have been doing the most that you could do in a positive manner

15  while you've been incarcerated are all very good signs for your

16  future.

17        And I've looked carefully at your upbringing and some of

18  the really unfortunate parts of that, and I've looked at the

19  evaluation by the University of Virginia Forensic Clinic, and

20  I've looked at your personal background carefully.  And, as both

21  counsel have said, my job is to look at the nature of the

22  offense, the harm to victims, look at the need to deter you or

23  others from committing this conduct, to look at you personally,

24  you as a person, and combine those factors and arrive at the

25  proper sentence.  And, of course, the Sentencing Guidelines are

1  something that every judge must consider as well, and those

2  Guidelines are 51 to 60 months in this case, and they are for a

3  good reason.  The harm that you and your co-conspirators caused

4  was very significant.  The trauma for those that were at the

5  Alfred Street Baptist church, the trauma to the ProPublica family

6  that was targeted, and just the seriousness of the swatting

7  language used and the position that you put law enforcement in

8  responding to what they believed was going to be the most serious

9  of possible situations where their own lives would be in danger

10 from the supposed callers, all of that has caused great trauma to

11 all of those individuals and to the community and to -- you know,

12 there was clear racial animus here.  It was disturbing to see

13 that you had aligned yourself with Mr. Denton and co-conspirator

14 3 knowing that he was an Attomwaffen founder and a clear white

15 supremacist, and I take you at your word that you recognize the

16 seriousness of how wrong that was and that you are going to work

17 to make sure that that never seeps into your mind again.  But it

18 just demonstrates how far out you were and how aligned you were

19 with this group.

20      And so the offense is a serious one, as you have

21 acknowledged and that's very clear from the facts, and so a

22 sentence of time served is not appropriate, and it does not take

23 into consideration all of the 3553 factors.  And, on the other

24 hand, a Guideline sentence, given your age, given your family

25 history, some of the struggles you've had with your own mental

1    health, is too much time as well.

2        I'm going to sentence you to 33 months of incarceration, a

3    hundred dollar special assessment, three years of supervised

4    release.  I'll not impose a fine.

5        As special conditions of supervised release, I'll order

6    that you participate in a program approved by the United States

7    Probation Office for substance abuse, as well as mental health

8    treatment; that you comply with the requirements of a computer

9    monitoring program as administered by the Probation Office; that

10   you not engage in spamming or e-mail bombing.  I've signed the

11   restitution order requiring you to pay restitution in the amount

12   of $7,560.69, and that will be payments of a hundred dollars per

13   month or as directed by the probation officer, depending on your

14   financial situation.  I'll give you credit for time served

15   awaiting sentencing.

16       Ms. Mertz, do you have a designation request?

17       MS. MERTZ:  Your Honor, we would ask the Court to

18   recommend either -- I think either Petersburg, if it's available,

19   or as close to Northern Virginia as possible.

20       We would -- Court's indulgence.

21       THE COURT:  Yes.

22       MS. MERTZ:  May I have a minute?

23       (Discussion had off the record between attorney and

24   defendant.)

25       MS. MERTZ:  Thank you, Your Honor.  Your Honor, we would

1    ask that the Court's judgment include a recommendation for a life

2    skills or mental health assistance while in custody so that

3    Mr. Kelley's designation will account for some of his deficits.

4         THE COURT:  Okay.  All right.  I'm sorry, you said life

5    skills and --

6         MS. MERTZ:  Mental health, mental health treatment.

7         THE COURT:  All right.  I'm happy to make both of those

8    recommendations.

9         MS. MERTZ:  Thank you, Your Honor.

10        THE COURT:  All right.  Anything else in this matter?

11        MS. CUELLAR:  No, Your Honor.

12        MS. MERTZ:  No, Your Honor.

13        THE COURT:  All right.  Thank you, counsel.  Mr. Kelley,

14   it's all up to you now.  You're 20 years old.  You have the

15   opportunity to do whatever you want to with your life, and I'm

16   very hopeful that you'll learn from this.  To the extent that you

17   can help other juveniles understand how harmful this is, please

18   do so, and I wish you the best, sir.

19        THE DEFENDANT:  All right.

20        THE COURT:  We're in recess.

21        (Proceedings adjourned at 10:50 a.m.)

22

23

24

25

1

2

3

<u>**C E R T I F I C A T E**</u>

4

                    I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of

5

proceedings in the above-entitled matter.

6

7

    /s/ Scott L. Wallace                    4/1/21
    ---------------------------      ----------------
      **Scott L. Wallace, RDR, CRR           Date**

8

        **Official Court Reporter**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25